

No. 3:18-CV-252-CWR-FKB

SECURITIES & EXCHANGE COMMISSION,
*et al.*,

*Plaintiffs*,

v.

ARTHUR LAMAR ADAMS,
*et al.*,

*Defendants*.

ORDER ESTABLISHING RECEIVER SELECTION PROCESS

Before CARLTON W. REEVES, *District Judge*.

This case involves a multi-million dollar Ponzi scheme that defrauded hundreds of investors. The ill-gotten gains of that scheme now reside in Defendants' estates. The Court has de-

termined that a receivership over those estates is appropriate.[1] After conferring with the parties, the Court has created a process for selecting a Receiver that incorporates their advice.

The Court believes that particular care is necessary in appointing officers of the federal judiciary, an institution that fails to reflect the diversity of the public it serves. Just one in five Article III judges are people of color, and only one in three are women.[2] Since 2017, less than one in ten people appointed as Article III judges have been people of color, and less than one in four have been women.[3] Bankruptcy and magistrate judges appointed by the judiciary are even less diverse,[4] and people of color are hired for just one in six clerkship positions.[5] When federal judges appoint counsel in multi-district

---

[1] *Order Granting in Part and Denying in Part Motions to Appoint Receiver*, Docket No. 25.

[2] Federal Judicial Center, *Demography of Article III Judges, 1789-2017*, accessed May 31, 2018; *see also* Minority Corporate Counsel Association, *Tracking the Integration of the Federal Judiciary*, accessed May 31, 2018.

[3] Alliance for Justice, *Judicial Selection Snapshot*, Apr. 25, 2018; *see also* Matthew Nussbaum, *Trump's Judges, U.S. Attorneys Overwhelmingly White Men*, POLITICO, May 10, 2018.

[4] Office of the U.S. Courts, THE JUDICIARY FAIR EMPLOYMENT PRACTICES ANNUAL REPORT, FISCAL YEAR 2015-2016 (2017).

[5] *See* National Association for Law Placement, *Increasing Diversity of Law School Graduates Not Reflected Among Judicial Clerks,* NALP Bulletin (Sept. 2014); *see also* Tony Mauro, *Mostly White and Male: Diversity Still Lags Among SCOTUS Law Clerks*, NAT'L LAW J., Dec. 11, 2017 (finding that "since 2005—when the Roberts court began—85 percent of all law clerks have been white," and that "[t]wice as many men as women" get hired); Weatherspoon, *The Status of African American Males in the Legal Profession: A Pipeline of Institutional Roadblocks and Barrier*, 80 Miss. L. J., 260, 275 (2010) (In 2009, African-American men composed only 1% of all judicial law

litigation, fewer than one in five leadership positions are filled by women.[6]

The same lack of diversity defines the broader legal profession. Despite making up a quarter of the country, people of color represent just one in ten lawyers, and only a third of lawyers are women.[7] At major law firms, fewer than one in

---

clerks, described as "some of the most prestigious positions in the legal profession.").

[6] *See* Dana Alvaré, *Vying for Lead in the 'Boy's Club': Understanding the Gender Gap in Multidistrict Litigation Leadership Appointments* (2017); *see also* Elizabeth A. Fegan, *An Opportunity or Landmine: Promoting Gender Diversity from the Bench*, Fed. Law., May 2016, at 38, 40 n. 16; Hon. Stanwood R. Duval, Jr., *Considerations in Choosing Counsel for Multidistrict Litigation Cases and Mass Tort Cases*, 74 LA. L. REV. 391, 393 (2014). Courts have taken admirable steps to close this disparity. *See, e.g.*, Stephanie Francis Ward, *Women Should Be Among Lead Lawyers in IUD Case, Federal Judge Says*, ABA JOURNAL, May 20, 2013; Michael Baylson and Cecily Harris, *Equal Opportunity?*, 101 JUDICATURE 65, 67 (2017) (describing application procedure in *In re: Volkswagen "Clean Diesel" Marketing*, No. 15-MD-2672 (N.D. Cal. Dec. 22, 2015) that has "the potential to increase diversity among lead counsel"); *In re Ethicon, Inc., Power Morcellator Prod. Liab. Litig.*, No. 15-MD-2652-KHV, 2015 WL 7303527, at *1 (D. Kan. Nov. 19, 2015) (appointing majority of women as lead counsel) *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 137 (E.D. La. 2013) (noting importance of diversity in appointment of lead counsel); *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007) (requiring diversity in appointment of lead counsel).

[7] *Compare* U.S. Census Bureau, *QuickFacts: United States* (2017) *with* Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, last modified Jan. 19, 2018.

ten partners are people of color, and fewer than one in four partners are women.[8]

Deeper patterns of exclusion appear in Mississippi. While black people make up 40% of the population,[9] they represent fewer than 16% of Mississippi's federal bankruptcy, circuit, district, and magistrate judges.[10] One survey found that fewer than 4% of federal clerks hired in Mississippi, Louisiana, and Texas were black.[11] People of color represent fewer than 11% of the Mississippi bar.[12] Women make up fewer than 16% of Mississippi's federal bankruptcy, circuit, district, and magistrate judges, and just 23% of the state's lawyers.[13]

It is indisputable that systematic oppression lies behind much of the judiciary's lack of diversity. The legal profession's exclusion and discrimination against people of color, especially in federal courts, have been well documented.[14] Research also

---

[8] *See* National Association for Law Placement, *2017 Report on Diversity in U.S. Law Firms* ([2017](#)); *accord* David B. Wilkins, *From "Separate Is Inherently Unequal" to "Diversity Is Good for Business": The Rise of Market-Based Diversity Arguments and the Fate of the Black Corporate Bar*, 117 HARV. L. REV. 1548 (2004).

[9] U.S. Census Bureau, *State & County QuickFacts: Mississippi* ([2017](#)).

[10] Data on was collected from the websites of both the Northern District and Southern District of Mississippi.

[11] *See* Table 2 – Racial/Ethnicity Distribution of Judicial Clerkships by Level of Clerkship: 1994-1998 in National Association for Law Placement, *Courting Clerkships: The NALP Judicial Clerkship Study* ([Oct. 2000](#)).

[12] *See* Mississippi Bar, *Membership Data* ([Feb. 2018](#)).

[13] *See id. and supra* at n. 10.

[14] *See generally* J. Clay Smith, Jr., EMANCIPATION: THE MAKING OF THE BLACK LAWYER 1844–1944 (1993); William Lewis Burke, ALL FOR CIVIL RIGHTS: AFRICAN AMERICAN LAWYERS IN SOUTH CAROLINA, 1868-1968

establishes that federal courts are "places of discrimination" for women, where they feel "invisible" and face "pain, isolation, and injury"[15] – especially from men cloaked in the robes of justice.[16] Particularly hurtful strains of race- and sex-based hatred have appeared in Mississippi's judiciary.[17]

---

(2017); Kenneth W. Mack, REPRESENTING THE RACE: THE CREATION OF THE CIVIL RIGHTS LAWYER (2014); Sheldon Goldman, PICKING FEDERAL JUDGES: LOWER COURT SELECTION FROM ROOSEVELT THROUGH REAGAN (1997); *see also Report of the First Circuit Gender, Race and Ethnic Bias Task Forces*, 9 B.U. PUB. INT. L.J. 173 (2000); Sharon E. Grubin and John M. Walker Jr., *Report of the Second Circuit Task Force on Gender, Racial, and Ethnic Fairness in the Courts*, 1997 ANN. SURV. AM. L. 9 (1997); *accord* Jeffrey J. Rachlinski et al., *Does Unconscious Racial Bias Affect Trial Judges*, 84 NOTRE DAME L. REV. 1195 (2009); Ian F. Haney Lopez, *Institutional Racism: Judicial Conduct and A New Theory of Racial Discrimination*, 109 Yale L.J. 1717 (2000); Bryan A. Stevenson and Ruth E. Friedman, *Deliberate Indifference: Judicial Tolerance of Racial Bias in Criminal Justice*, 51 WASH. & LEE L. REV. 509 (1994).

[15] Judith Resnik, *Gender Bias: From Classes to Courts*, 45 STAN. L. REV. 2195, 2208-09 (1993); *see also* Lilia M. Cortina, *The Study of Gender in the Courts: Keeping Bias at Bay*, 27 LAW & SOC. INQUIRY 199 (2002); Lynn Hecht Schafran, *Will Inquiry Produce Action? Studying the Effects of Gender in the Federal Courts*, 32 U. RICH. L. REV. 615 (1998); Vicki C. Jackson, *What Judges Can Learn from Gender Bias Task Force Studies*, 81 JUDICATURE 15 (1997); Tonja Jacobi & Dylan Schweers, *Justice, Interrupted: The Effect of Gender, Ideology, and Seniority at Supreme Court Oral Arguments,* 103 VA. L. REV. 1379 (2017); *accord* Deborah L. Rhode, *Gender and Professional Roles*, 63 FORDHAM L. REV. 39 (1994); Goldman *supra* at n. 14.

[16] *See* Niraj Chokshi, *Federal Judge Alex Kozinski Retires Abruptly After Sexual Harassment Allegations*, N.Y. TIMES, Dec. 28, 2017; Debra Cassens Weiss, *Federal Judge Retires Amid Investigation Into Alleged Sexual Harassment*, ABA JOURNAL, Sept. 20, 2016; Tom Cohen, *Victims Allege Years of Sexual Misconduct by Federal Judge*, CNN, Jun. 3, 2009.

[17] *See* Smith, *supra* n. 14 at 288-300; Irvin C. Mollison, *Negro Lawyers in Mississippi*, 15 J. OF NEGRO HISTORY 38 (1930); Neil R. McMillen, DARK

No doubt, some steps have been taken to remove these stains. Still, when given the opportunity, courts should take steps to increase their diversity. Justice is a search for truth.[18] That search will fail if a court does not incorporate a wide array of experiences, facts, and perspectives into its decisionmaking processes.[19] "The case for diversity is especially compelling for the judiciary," as District Judge Edward M. Chen has said.

---

JOURNEY: BLACK MISSISSIPPIANS IN THE AGE OF JIM CROW 168-70 (1989); Taylor Branch, PARTING THE WATERS: AMERICA IN THE KING YEARS 1954-63 508 (1989); Gordon A. Martin, Jr., COUNT THEM ONE BY ONE: BLACK MISSISSIPPIANS FIGHTING FOR THE RIGHT TO VOTE (2010); *Martin v. Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987); *see also* John W. Winkle III & Justin Wedeking, *Perceptions and Experiences of Gender Fairness in Mississippi Courts*, 87 JUDICATURE 126 (2003); M. Carolyn Ellis, *The Decline and Near Fall of Statutory Sexism in Mississippi*, 51 MISS. L.J. 191 (1980).

[18] *See Tehan v. U.S. ex rel. Shott*, 382 U.S. 406, 416 (1966) ("The basic purpose of a trial is the determination of truth.").

[19] *See generally* Nicole E. Negowetti, *Judicial Decisionmaking, Empathy, and the Limits of Perception*, 47 AKRON L. REV. 693 (2014); Jill D. Weinberg and Laura Beth Nielsen, *Examining Empathy: Discrimination, Experience, and Judicial Decisionmaking*, 85 S. CAL. L. REV. 313 (2012); Robert J. Boeckmann, *The Surprising Liability and Fundamental Assets of Diverse Juries*, 17 LAW CONTEXT: A SOCIO-LEGAL J. 113 (2000); Sherrilyn Ifill, *Judicial Diversity*, 13 Green Bag 2d 45 (2009) ("[J]udiciaI decisionmaking is not just about outcomes; it is also about the *process* of decisionmaking.") (emphasis in original); *see also* Hon. Sonia Sotomayor, *A Latina Judge's Voice, Raising the Bar: Latino and Latina Presence in the Judiciary and the Struggle for Representation, Judge Mario G. Olmos Memorial Lecture*, 13 BERKELEY LA RAZA L.J. 87 (2002) ("Personal experiences affect the facts that judges choose to see."); Hon. Benjamin Cardozo, THE NATURE OF THE JUDICIAL PROCESS 13 (1921) ("We may try to see things as objectively as we please. None the less, we can never seem them with any eyes except our own."); Hon. Oliver Wendell Holmes, THE COMMON LAW 1 (1881) ("The life of the law has not been logic; it has been experience.").

"How can the public have confidence and trust in such an institution if it is segregated – if the communities it is supposed to protect are excluded from its ranks?"[20] To deliver justice and ensure its legitimacy, then, the judiciary must diversify itself.[21]

In fulfilling that duty here, the Court will use the "inherent power" courts have "to provide themselves with appropriate instruments required for the performance of their duties."[22] The Court will require the Receiver to take steps to guarantee that its hiring practices are as inclusive as possible, ensuring

---

[20] Hon. Edward M. Chen, *The Judiciary, Diversity, and Justice for All*, 91 CALIF. L. REV. 1109, 1117 (2003); *see also* Tom Tyler, *Governing Amid Diversity: The Effect of Fair Decisionmaking Procedures on the Legitimacy of Government*, 28 LAW & SOC'Y REV. 809 (1994); Louis Fuentes-Rohwer and Kevin R. Johnson, *A Principled Approach to the Quest for Racial Diversity on the Judiciary*, 10 MICH. J. OF RACE & L. 2, 6 (2004) (2004) ("Virtually every legal actor understands that a judge's biases, perspectives, and life experiences influence judicial decisionmaking."); Ifill, *supra* n. 17, at 46 ("Promoting inclusion of racial and ethnic minorities, women and judges from a variety of backgrounds on our courts is a positive an important value.").

[21] *See generally* Carl Tobias, *Justifying Diversity in the Federal Judiciary*, 106 NW. U.L. REV. COLLOQUY 283 (2012); *see also* Pat K. Chew and Robert E. Kelley, *Myth of the Color-Blind Judge: An Empirical Analysis of Racial Harassment Cases*, 86 WASH. U. L. REV. 1117 (2009); Jennifer L. Peresie, *Female Judges Matter: Gender and Collegial Decisionmaking in the Federal Appellate Courts*, 114 YALE L.J. 1759 (2005); Sherrilyn A. Ifill, *Racial Diversity on the Bench: Beyond Role Models and Public Confidence*, 57 WASH. & LEE L. REV. 405 (2000); Susan Moloney Smith, *Diversifying the Judiciary: The Influence of Gender and Race on Judging*, 28 U. RICH. L. REV. 179 (1994); Christopher D. Kromphardt, *Evaluating the Effect of Law Clerk Gender on Voting at the United States Supreme Court*, 38 JUST. SYS. J. 183 (2017); Kate Berry, *Building a Diverse Bench: A Guide for Judicial Nominating Commissioners*, Brennan Center for Justice (2016).

[22] *Ex Parte Peterson*, 253 U.S. 300, 312 (1920).

the participation of those who have traditionally been excluded from legal work in America. Applicants are encouraged to commit to bold and creative steps involving recruiting, retaining, hiring, and other staffing concerns in their applications. Through their fulfillment, those steps may aim for – though may not guarantee achievement of – targets for billable hours performed by those underrepresented in the legal profession. Even steps that aim for very modest targets, such as 25% of hours being conducted by women and 20% of hours being conducted by people of color, would be laudable.

The Court is looking for a candidate who has the proper professional experience, business acumen, communication skills, ability to manage conflicts of interest, and commitment to inclusion. In sum, the Receiver must be deeply qualified to do justice and identify, collect, and protect all property subject to the receivership and minimize dissipation of estate assets.

The Court has posted a Receivership Application on the Southern District's website and Twitter account. Candidates (including those whom the parties have previously endorsed) should submit their applications either electronically ([reeves_chambers@mssd.uscourts.gov](mailto:reeves_chambers@mssd.uscourts.gov)) or physically to the Court by 5:00 p.m. Central on June 8, 2018. By June 15, the Court expects to provide select applicants with information necessary to conduct a complete pre-appointment conflicts check. The results of that check should be submitted to the Court by the close of business on June 22. The Court will strive to appoint a receiver by July 1.

SO ORDERED, this the 1st day of June, 2018.

s/ CARLTON W. REEVES<br>*United States District Judge*