# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | No: 3:18-cv-252 |
| Plaintiffs, | **Carlton W. Reeves, District Judge** |
| v. | |
| **ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,** | |
| Defendants. | |

## RECEIVER'S REPORT

### October 19, 2018

*/s/ Alysson Mills*

Alysson Mills, Miss. Bar No. 102861
Fishman Haygood, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Telephone: 504-586-5253
Fax: 504-586-5250
amills@fishmanhaygood.com

*Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC*

**Introduction**

For many years Arthur Lamar Adams, through his company Madison Timber Properties, LLC, operated a Ponzi scheme that defrauded hundreds of investors. On May 9, 2018, he pleaded guilty to the federal crime of wire fraud.

On June 22, 2018, the Court appointed me Receiver of the estates of Adams and Madison Timber ("Receivership Estate"). The order of appointment sets forth my responsibilities and duties. Among other things, the order instructs me to take any action necessary and appropriate to preserve the assets of Adams and his businesses, to maximize funds available for distributions to victims.

The Court instructed me to file a report of my progress every 60 days. I filed my first report on August 21, 2018 (updated August 29, 2018). My first report summarized background facts, my duties, my actions to date, my preliminary findings, my preliminary plan, and my recommendations, all as of August 21, 2018.

This, my second report, picks up where my first report left off. It does not repeat the same information, except as necessary for context. It contains the following parts:

|  | *page* |
|---|---|
| Recent filings or events | 3 |
| Receiver's actions in the past 60 days | 10 |
| Receiver's plan for the next 60 days | 15 |
| Summary of known assets | 18 |

As always, my reports are for the Court's benefit, but I write them for a broader audience, knowing that they may be read by non-lawyers including victims. I remain sensitive to potential ongoing criminal investigations and do not disclose information that might impair their progress.

2

**Recent filings or events**

*United States v. Adams, No. 3:18-cr-88*

The Court scheduled Adams's sentencing for October 29, 2018, at 10:00 a.m., in Courtroom 5B. The sentencing is open to the public.

*Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-252*

There have been no public filings or events.

*Alysson Mills vs. Michael D. Billings, et al., No. 3:18-cv-679*

On October 1, 2018, I filed a complaint against Michael D. Billings and MDB Group, LLC; Terry Wayne Kelly, Jr. and Kelly Management, LLC; and William B. McHenry, Jr. and First South Investments, LLC. Select filings, including the complaint, are available at madisontimberreceiver.com.

The complaint alleges the defendants identified new investors for Madison Timber, and for each investment made by an investor he personally recruited, each defendant received a cut of the investor's payment to Madison Timber. Over time, the defendants received more than $16,000,000 in Madison Timber "commissions." The complaint alleges the following facts:

13.

Beginning in approximately 2004, Adams, through Madison Timber, operated a Ponzi scheme that purported to purchase timber from Mississippi landowners and resell it to Mississippi lumber mills at higher prices.

14.

Investors in Madison Timber delivered to Madison Timber large sums of money, typically in excess of $100,000 dollars, in reliance on the promise that Madison Timber would repay them their principal plus interest of not less than 12% per annum, and sometimes as much as 20% per annum. The promised interest invariably far exceeded the interest any investor might receive on any other collateralized investment.

15.

Investors believed that Madison Timber would use their money to acquire timber deeds and cutting agreements from Mississippi landowners; that Madison Timber would then sell the timber to Mississippi lumber mills at a higher price; and that with the

proceeds of those sales Madison Timber would repay investors their principal and promised interest.

16.

In exchange for their investments, investors in the Madison Timber Ponzi scheme received a promissory note in the amount of their investment, payable in twelve monthly installments together with the promised interest; twelve pre-dated checks, each in the amount of the installment due under the promissory note; a timber deed and cutting agreement by which a named landowner purported to grant to Madison Timber the rights to harvest timber on the land described in the deed; and a timber deed and cutting agreement by which Madison Timber purported to grant its own rights to the investor.

17.

Investors did not know that, in fact, the timber deeds and cutting agreements that they received were fake.

18.

Investors did not know that because Madison Timber had no, or virtually no, revenues whatsoever, investors were being repaid with new investors' money.

19.

Each month, Madison Timber required more and more new investors to repay existing investors. Defendants identified new investors and sold to them Madison Timber investments.

20.

For each investment made by an investor he personally recruited, each Defendant received a cut of the investor's payment to Madison Timber. Over time, Defendants received more than $16,000,000 in Madison Timber "commissions."

21.

In April 2018, on the heels of investigations of him by the F.B.I. and the U.S. Attorney's Office for the Southern District of Mississippi, Adams turned himself in.

22.

The U.S. Attorney's Office for the Southern District of Mississippi charged Adams with two counts of wire fraud and one count of bank fraud in connection with a broader scheme to defraud. Among other things, the bill of information states that as "part of the scheme and artifice to defraud" Adams "paid commissions to recruiters who referred investors to [him]":

> The commissions were paid from investors' money. For example, ADAMS paid one recruiter approximately two million four hundred forty-five thousand four hundred and forty-nine dollars ($2,445,449) in

commissions in 2017 alone. ADAMS paid another recruiter approximately one million six hundred twenty-eight thousand one hundred dollars ($1,628,100) in commissions in 2017 . . . .

23.

Separately, the S.E.C. charged Adams with violations of the Securities Act of 1933 and Securities & Exchange Act of 1934, alleging in its complaint that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme."

24.

On May 9, 2018, Adams pleaded guilty to the federal crime of wire fraud in connection with his operation of the Madison Timber Ponzi scheme. The fact that Madison Timber was a Ponzi scheme is not in dispute.

My desire is to resolve the Receivership Estate's claims against each of the defendants efficiently, to minimize time and expense to the Receivership Estate. Before I filed the complaint, I invited each defendant to join me in the filing of a motion that proposes terms by which the parties might attempt to negotiate a settlement. I agreed to suspend further litigation against a defendant if the defendant waived certain procedural objections and agreed to 1) make a full and complete financial disclosure, 2) commit to negotiate in good faith, and 3) preserve assets pending negotiations.

Billings (and MDB Group) did not join my motion. Relevant to Billings, the complaint alleges the following facts:

FACTUAL ALLEGATIONS RELEVANT TO BILLINGS AND MDB GROUP

25.

Billings became a recruiter for Madison Timber by no later than 2012, while he was employed by Butler Snow Business Advisory Services, LLC ("Butler Snow"). Madison Timber paid Butler Snow a monthly retainer for "strategic business development, strategic financing/capital strategies and overall management advisory" services. Butler Snow and Billings introduced Madison Timber to potential investors and Madison Timber paid Butler Snow and Billings a "success fee" when an investor invested.

26.

In December 2013, Billings left Butler Snow for the prospect of recruiting new investors to Madison Timber fulltime. Adams agreed to pay Billings 2%, and later 2.5%, of each dollar of each investment made by an investor that Billings personally recruited. In addition, Madison

Timber paid Billings a fee of $10,000, and later $12,500, a month. These agreements were honored until the collapse of the Ponzi scheme in April 2018.

27.

Among Adams's "bird dogs," Billings was a standout. On information and belief, when Adams met Billings in 2012, Madison Timber had annual investments of approximately $15,000,000. With Billings's help, the Ponzi scheme ballooned. Billings targeted large investors in Texas and California, often dropping certain investors' names to attract new investors. On information and belief, Billings personally "booked" more than $80,000,000 in investments in 2017 alone. Billings was always hunting for "more, and more and more!!"

28.

Billings promoted Madison Timber as a safe and secured investment that paid interest at rates that substantially exceeded market interest rates. In a typical presentation, Billings told the investor that the investment was safe because Madison Timber had longstanding relationships with Mississippi lumber mills that would pay a premium to lock-down timber rights. Billings explained that proceeds from the sale of timber would pay the investor monthly installments of one-twelfth of their principal investment, plus interest.

29.

Billings told the investor that a default was highly unlikely, but in the event of a default, the investor would be fully protected because his or her promissory note was secured by his or her own timber deed and cutting agreement that the investor could liquidate for whatever remaining amount Madison Timber owed. In fact, the timber deeds and cutting agreements were worthless.

30.

A cursory inspection of Madison Timber's operations would have revealed Madison Timber to be a classic Ponzi scheme. Among other things, Billings knew or should have been aware of each of the following—any one of which is suspicious standing alone, but taken together clearly evidence a fraud:

   a) The timber deeds and cutting agreements between landowners and Madison Timber were fake. Indeed the landowners' signatures, forged by Adams, often looked the same. *A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land, would have confirmed the truth.*

   b) Madison Timber had no contracts with lumber mills. *A call to any one of the lumber mills for which Madison Timber purported to have supply agreements would have confirmed the truth.*

   c) Madison Timber required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment due under the promissory note.

   d) The interest rate that Madison Timber paid was typically 300% to 400% of that payable by any other fully collateralized investment.

   e) Madison Timber purported to have identified lumber mills with insatiable demand for timber and at uniform prices. *The market price for timber is readily*

6

> *available from multiple sources, and any one of those sources would have confirmed that the market price for timber rises and falls, sometimes dramatically, over short periods of time.*
>
> f) In October 2016, Madison Timber abruptly changed banks, and each recruiter was responsible for collecting within a short period of time all outstanding pre-dated checks from his individual investors and then reissuing new pre-dated checks drawn from Madison Timber's new account at a different bank. *Billings's investors transacted their business via wires. Billings told his investors that "[o]ur banker of some twenty plus years left Trustmark Bank, and we of course went with him."*

31.

Moreover, Billings was paid to understand Madison Timber's business. At Butler Snow, Billings provided "strategic business development, strategic financing/capital strategies and overall management advisory" services to Madison Timber. Billings knew or should have known that Madison Timber was a Ponzi scheme. At a bare minimum, in inducing persons to invest, Billings was reckless and indifferent as to the existence of the Ponzi scheme.

32.

In August 2017, Billings celebrated his "fifth anniversary" with Madison Timber. He thanked Adams for the "exceptional association and collaboration" and said "it is truly amazing what we have accomplished together." He reflected: "I can't decide whether 'The Odd Couple', Grumpy Old Men' . . . or at this point perhaps just 'Big' would be the best title to describe us. . . . I can only conclude that it is 'A God Thing'!!"

33.

Between 2013 and April 2018, Billings induced dozens of persons to invest in Madison Timber. In exchange, he and MDB Group received Madison Timber "commissions" of not less than $3,513,780.

34.

On information and belief, between 2013 and April 2018, Billings's Madison Timber "commissions" made up all or virtually all of MDB Group's income. MDB Group had no other business; it was funded solely with proceeds of the Madison Timber Ponzi scheme. It had no operations and no employees. Billings was MDB Group's sole manager and member, and directed the disbursement of MDB Group's income to himself.

Kelly (and Kelly Management) and McHenry (and First South Investments) joined my motion, and we separately undertook a 14-day negotiation.

On October 17, 2018, I advised the Court that my negotiations with Kelly were productive and it is likely that the Receivership Estate and Kelly soon will agree to a proposed settlement that I can recommend to the Court. I advised the Court that the Receivership Estate

and McHenry are unable to reach a settlement at this time and that I would amend the complaint accordingly.

On the same day, October 17, 2018, I amended my complaint to allege further factual allegations against McHenry. Relevant to McHenry, the amended complaint now alleges the following facts:

FACTUAL ALLEGATIONS RELEVANT TO MCHENRY AND FIRST SOUTH

37.

McHenry became a recruiter for Madison Timber by no later than 2010. McHenry demanded, and Adams agreed to pay to McHenry, 10% of each dollar of each investment made by an investor that McHenry personally recruited. Upon information and belief, the agreement was not committed to writing but was honored until the collapse of the Ponzi scheme in April 2018.

38.

Many of McHenry's investors were elderly retirees. On information and belief, he met some of them in older adult Sunday school classes. McHenry cultivated relationships with these individuals by visiting them, praying with them, bestowing gifts on them—even taking them hunting when they could no longer go by themselves. These individuals could not afford to risk their life savings on purported timber investments, but McHenry gained their trust and then took their money. It is alleged that in one instance, McHenry, after learning at church that one couple was suffering financial difficulties, presented himself as an answer to their prayers. Allegedly, he told the couple that God had led him to contact them. These individuals have been devastated by this Ponzi scheme. The stress has negatively impacted their health, and some struggle now to pay for basic necessities.

39.

McHenry promoted Madison Timber as a safe and secured investment that paid interest at rates that substantially exceeded market interest rates. In a typical presentation, McHenry told the investor that the investment was safe because Madison Timber had longstanding relationships with Mississippi lumber mills that would pay a premium to lock-down timber rights. McHenry explained that proceeds from the sale of timber would pay the investor monthly installments of one-twelfth of their principal investment, plus interest.

40.

McHenry told the investor that a default was highly unlikely, but in the event of a default, the investor would be fully protected because his or her promissory note was secured by his or her own timber deed and cutting agreement that the investor could liquidate for whatever remaining amount Madison Timber owed. In fact, the timber deeds and cutting agreements were worthless.

41.

A cursory inspection of Madison Timber's operations would have revealed Madison Timber to be a classic Ponzi scheme. Among other things, McHenry knew or should have been aware of each of the following—any one of which is suspicious standing alone, but taken together clearly evidence a fraud:

a) The timber deeds and cutting agreements between landowners and Madison Timber were fake. Indeed the landowners' signatures, forged by Adams, often looked the same. *A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land, would have confirmed the truth.*

b) Madison Timber had no contracts with lumber mills. *A call to any one of the lumber mills for which Madison Timber purported to have supply agreements would have confirmed the truth.*

c) Madison Timber required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment due under the promissory note.

d) The interest rate that Madison Timber paid was typically 300% to 400% of that payable by any other fully collateralized investment.

e) Madison Timber purported to have identified lumber mills with insatiable demand for timber and at uniform prices. *The market price for timber is readily available from multiple sources, and any one of those sources would have confirmed that the market price for timber rises and falls, sometimes dramatically, over short periods of time.*

f) In October 2016, Madison Timber abruptly changed banks, and each recruiter was responsible for collecting within a short period of time all outstanding pre-dated checks from his individual investors and then reissuing new pre-dated checks drawn from Madison Timber's new account at a different bank.

42.

McHenry, in fact, shared a small office with Adams and so would have observed Adams fabricating timber deeds and cutting agreements. Certainly he would have observed the stacks of fake documents that littered the office.

43.

Between 2010 and April 2018, McHenry induced approximately twenty people to invest in Madison Timber. In exchange, he and First South received Madison Timber "commissions" of not less than $3,473,320.

9

44.

Upon information and belief, between 2010 and April 2018, McHenry's Madison Timber "commissions" made up all or virtually all of First South's income. First South had no other business; it was funded solely with the proceeds of the Madison Timber Ponzi scheme. It had no operations and no employees. McHenry was First South's sole manager and member, and directed the disbursement of First South's income to himself.

Along with the amended complaint, I also filed a motion for preliminary injunction that seeks an order restraining Billings and McHenry from dissipating any assets, or any assets traceable to assets, they received from Madison Timber.

As of this report's filing, neither Billings nor McHenry has responded to the amended complaint or the motion for preliminary injunction.

**Receiver's actions in the past 60 days**

Since I filed my first report on August 21, 2018, I have:

*Filed Alysson Mills vs. Michael D. Billings, et al., No. 3:18-cv-679*

As summarized above, I filed a lawsuit to recover "commissions" from Billings, Kelly, and McHenry. The complaint and related filings are available at madisontimberreceiver.com.

On October 17, 2018, I advised the Court that my negotiations with Kelly were productive and it is likely that the Receivership Estate and Kelly soon will agree to a proposed settlement that I can recommend to the Court.

*Accounted for "commissions"*

I previously reported that I had issued notices to known recruiters. The notices advised that I was undertaking an accounting of "commissions" paid to them by Adams or Madison Timber; that any "commissions" were paid with stolen money; and that I intend to take any and all action necessary to return that money to the Receivership Estate.

As summarized above, I filed a lawsuit to recover "commissions" from Billings, Kelly, and McHenry. The complaint and related filings are available at madisontimberreceiver.com.

10

There are more recruiters, and even sub-recruiters. To date, I have identified at least ten. As I have identified new recruiters, I have issued new notices. I anticipate that I will file new complaints as I make complete accountings for "commissions" paid.

*Accounted for gifts to Adams's family*

I previously reported that I had issued notices to Adams's family. The notices advised that I was undertaking an accounting of gifts made to them by Adams or Madison Timber; that any gifts of money were gifts of stolen money; and that I intend to take any and all action necessary to return that money to the Receivership Estate.

Since then I have undertaken an accounting of gifts of money to Adams's wife and children using bank statements from Adams's accounts at various banks. I have determined that in the past five years Adams made cash gifts worth at least $213,000 to his children. I shared this accounting with Adams's children, and they have expressed their desire to cooperate with my recovery. I continue to account for gifts of money to Adams's wife.

*Accounted for gifts to the University of Mississippi*

I previously reported that I had identified substantial gifts to the Ole Miss Athletic Foundation—at least $49,900 in 2016 and $47,100 in 2017—and that I had advised the University of Mississippi that these gifts were made with stolen money and I intend to take any and all action necessary to return that money to the Receivership Estate.

I requested an accounting by the University of Mississippi of all gifts it received from Adams. The accounting reflects that in the past ten years Adams gave $402,100 to the Ole Miss Athletic Foundation and $400 to an academic scholarship fund. I have asked for more information so that I may assess, among other things, any alleged "tangible benefits" Adams may have received in exchange for these gifts.

I separately demanded that the Ole Miss Athletic Foundation refund money Adams paid it for ticket packages for the 2018 football and 2019 baseball seasons. I received a full refund of $39,667 on the Friday before the first home SEC game, Ole Miss v. Alabama.

*Accounted for gifts to other institutions*

In addition to gifts to the University of Mississippi, my review of bank records has identified gifts to other institutions. These include, but are not limited to, the following gifts of more than $10,000:

| | |
|---|---|
| American Freedom Assembly | $25,200.00 |
| Berachah Church | $100,649.00 |
| Operation Grace World Missions | $16,100.00 |
| R.B. Thieme, Jr., Bible Ministries | $130,649.00 |
| Rick Hughes Ministries | $20,500.00 |
| Century Club Charities, Inc. | $56,350.00 |

Adams made smaller gifts too numerous to itemize here to other organizations. Examples include the Trump Make America Great Again campaign ($1,400), Mississippi Children's Home Services ($1,400), the National Rifle Association ($945), and the Wounded Warrior Project ($120).

My accounting is ongoing. In the meantime, I am assessing the Receivership Estate's rights to money gifted to any institution or organization.

*Reviewed records from banks*

I previously reported that I had received and reviewed records from First Bank of Clarksdale, Southern Bancorp, River Hills Bank, Community Bank, and Jefferson Bank. Since then I have received and reviewed records from Trustmark Bank, Bank Plus, and Southern AgCredit. Cleveland State Bank still has not produced records requested of it.

I am still reviewing all records received for completeness. I have made follow-up requests for information as appropriate. The Court's order of appointment authorizes me to issue subpoenas for documents and testimony without further order of the Court and I am weighing the necessity of doing that.

*Reviewed records from accountant*

I previously reported that Adams and Madison Timber relied on a single accounting firm for their bookkeeping and tax filings, and that I had only recently received copies of those records. Since then I have reviewed those records with the assistance of Adams's accountant. With the Court's approval, and after a thorough background check, I retained a forensic accounting firm, AEA Group, to assist with my analysis, and its principal, Les Alexander, provided an affidavit in support of the motion for preliminary injunction I filed against Billings and McHenry in the lawsuit summarized above.

*Reviewed records from law firms*

I previously reported that I had requested copies of any and all documents relating to Adams or Madison Timber in the possession of law firms known to have provided various services to Adams or Madison Timber. Since then I have received and reviewed records from Butler Snow, LLP, and Rawlings & MacInnis, P.A. I have outstanding requests with other law firms. The Court's order of appointment authorizes me to issue subpoenas for documents and testimony without further order of the Court and I am weighing the necessity of doing that.

*Reviewed records from investment advisors and trust companies*

I previously reported that I had requested copies of any and all documents relating to Adams or Madison Timber in the possession of investment advisors and trust companies that facilitated investments in Madison Timber. Since then I have received and reviewed records from Madison Trust Company (no relation to Madison Timber) and LourdMurray. I expect to soon receive records from Pinnacle Trust.

*Worked with LLCs of which Adams was a member*

I previously reported that at the time he pleaded guilty, Adams was a member of at least six active limited liability companies ("LLCs") that own real estate. Since then, the following LLCs have taken the following action:

*Delta Farm Land Investments, LLC*: The LLC entered into a purchase agreement to sell its principal asset, 1170+ acres farmland in Oktibbeha County, Mississippi, on October 1, 2018. The purchaser is currently engaged in due diligence. The LLC anticipates that the sale will close on or before December 15, 2018. The LLC intends to dissolve after the sale and tender the proceeds representing Adams's interest to the Receivership Estate.

*KAPA Breeze, LLC*: The member of the LLC who had been paying himself out of the LLC's account returned those funds to the LLC. The LLC wants to find a buyer to purchase the interests of Adams and Kelly and thereafter continue to develop the LLC's principal asset, 1.5+/- acres mixed use land on Highway 30A in Florida. I would like to facilitate such a sale, but I have not received an offer that I believe represents a fair value for those interests. I have ordered an appraisal, but it has been delayed by Hurricane Michael. I am continuing to evaluate the Receivership Estate's options.

*707, LLC*: The LLC sold its principal asset, 263+ acres recreational land in Holmes County, Mississippi, for $400,000 on August 31, 2018. After paying down the mortgage and paying transaction costs, the LLC received $13,920.15. The LLC dissolved after the sale and tendered the proceeds representing Adams's, Kelly's, and McHenry's interests to the Receivership Estate, totaling $6,994.09.

*Conferred with federal and state authorities*

I have continued to confer with the U.S. Attorney's Office for the Southern District of Mississippi, the FBI, the Securities and Exchange Commission, and the Mississippi Secretary of State's Office regarding their investigations.

*Communicated with investors in Madison Timber*

I have continued to communicate with investors in Madison Timber via phone, letter, email, and in-person meetings. I speak to investors almost daily.

*Interviewed persons with knowledge*

I have continued to interview individuals with first-hand knowledge of matters bearing on the Receivership Estate, including Adams.

*Researched legal claims against third parties*

I previously reported that my colleagues and I had begun researching legal claims against third parties based on facts known to date. Our investigation and research necessarily continues as new information is received. I do not publish our assessments here because to do so would be to telegraph our legal strategies to future defendants.

*Retained a CPA to file Adams's and Madison Timber's taxes*

With the Court's approval, and after a thorough conflicts check, I retained Kimberly L. Hardy of Matthews Cutrer and Lindsay, P.A. in Jackson, Mississippi, to provide accounting and tax preparation services for the benefit of the Receivership Estate. Hardy has prepared 2017 tax returns for Adams and Madison Timber, and will assist me with the issuance of 1099s for the year 2018 to investors who were then-invested in Madison Timber.

**Receiver's plan for the next 60 days**

*Monetize Adams's interests in LLCs*

Adams's interest in 707, LLC has been resolved, as noted above. For the remaining five LLCs, I intend to liquidate the Receivership Estate's interest to maximize value to the Receivership Estate. For those LLCs for which the other members intend to liquidate the LLC's assets and dissolve, I am overseeing these corporate actions to ensure the liquidation is for a fair value. For those LLCs for which the other members intend to continue the LLC's operations, I am considering offers to purchase the Receivership Estate's interest and I will request the Court's approval prior to any sale. Currently:

*Delta Farm Land Investments, LLC*: As noted above, the LLC hopes to sell its principal asset, 1170+ acres farmland in Oktibbeha County, Mississippi, on or before December 15, 2018,

and thereafter dissolve and tender the proceeds representing Adams's interest to the Receivership Estate. I intend to continue to support the LLC in its efforts.

*KAPA Breeze, LLC*: As noted above, the LLC wants to find a buyer to purchase the interests of Adams and Kelly and thereafter continue to develop the LLC's principal asset, 1.5+/- acres mixed use land on Highway 30A in Florida. I would like to facilitate such a sale, so long as the purchase price represents a fair value for those interests. I intend to continue to consider offers. If I receive an offer that I believe is fair I will recommend it to the Court.

*Mallard Park, LLC*: I have received and reviewed records from the LLC and intend to continue to evaluate the Receivership Estate's options.

*Mash Farms, LLC*: The LLC's members have expressed an interest in purchasing Adams's interests. I anticipate obtaining an appraisal of the LLC's principal asset, 808+ acres with hunting camp in Sunflower County, Mississippi. Thereafter if I receive an offer that I believe is fair I will recommend it to the Court.

*Oxford Springs, LLC*: I continue to have discussions with the LLC's other principal member regarding the LLC's future. I intend to continue to evaluate the Receivership Estate's options.

*Liquidate Adams's remaining assets*

I previously reported that Adams's remaining assets are subject to forfeiture to the federal government at his sentencing; that if forfeited, the assets likely would be sold at public auction; and that the Receivership Estate likely can obtain a better value by liquidating them itself.

The assets in question include the house at 134 St. Andrews Drive, Jackson, Mississippi; the 2015 King Ranch Ford F150 truck; and any other assets in Adams's name, including any outstanding life insurance policies and any interests in any companies. The U.S. Attorney's Office has agreed to forego forfeiture proceedings to allow me to liquidate the assets myself, provided Adams voluntarily surrenders the assets to me via a quitclaim deed or other agreement that transfers title prior to his sentencing. Adams has preliminarily agreed to do that. In the

meantime, we are drawing up necessary documents to transfer title to the assets in question to the Receivership Estate.

*File additional lawsuits to recover commissions, fraudulent transfers, gifts*

I intend to file additional lawsuits to recover commissions, fraudulent transfers, and gifts as necessary to recover money that belongs to the Receivership Estate.  I continue to anticipate that some institutions and persons, including recruiters, who received stolen money will voluntarily pay it back to the Receivership Estate. Voluntary repayment will be welcomed, of course, because it will save the Receivership Estate considerable expense.

It is my position that the law permits me to try these lawsuits via a summary proceeding, which is a faster, more efficient proceeding.  Summary proceedings will minimize expense to the Receivership Estate. In the lawsuit already filed, summarized above, McHenry consented to the use of summary proceedings, but Billings did not.

In the lawsuit already filed, we required as a condition of any settlement negotiation that each defendant make a full and complete financial disclosure.  I intend to require similar financial disclosure as a precondition to settlement as appropriate going forward.

*Continue to assess legal claims against third parties*

I intend to continue to research legal claims against third parties as long as new information is received. In order to maximize the Receivership Estate's position, I am not disclosing publicly third-party targets.

*Continue communicating with investors*

I intend to continue communicating with investors, through my website, email, phone, and letters.  Investors provide information that is useful to my investigation and, in turn, I hope that I demystify the receivership process for them.

**Summary of status of assets**

As I previously reported, my end goal, of course, is to make an equitable distribution to victims with the money I recover. The money I have recovered to date would not go far. It may take a long time and a lot of work to recover enough money to make a meaningful distribution, but I am committed to pursuing recoveries for the benefit of victims as long as the Court allows. The Receivership Estate's most valuable assets may be the lawsuits it intends to file.

The current status of the Receivership Estate's assets is as follows:

| | | |
|---|---|---|
| **Receivership Estate's account at Hancock Bank** | | current balance $2,124,386.32 |
| Previous balance as of August 21, 2018 | $2,156,639.73 | |
| Cleveland State Bank account | +$1,447.98 | |
| 707, LLC proceeds | +$6,994.09 | |
| Interest | +$713.70 | |
| Ole Miss season tickets refund | +$39,667.00 | |
| Bank Fees | -$163.00 | |
| Receiver's and Receiver's counsel's fees | -$70,359.00 | |
| Receivership Estate's expenses | -$10,554.18 | |

***Alysson Mills vs. Michael D. Billings, et al.*, No. 3:18-cv-679**  settlement with Kelly likely; litigation
Lawsuit to recover $16,000,000 in commissions                           against Billings and McHenry ongoing

**House at 134 Saint Andrews Drive, Jackson, Mississippi**   subject to federal government forfeiture;
Purchased in 2011 for $364,000                               Adams has tentatively agreed to voluntarily
Appraised in 2016 for $777,000                                    surrender to Receivership Estate
Unencumbered

**Condo in Calton Hill subdivision in Oxford, Mississippi**   valuation in process;
Purchased in 2013 for $135,000                                title is in Adams's wife's name
Unencumbered

**2015 King Ranch Ford F150 truck**                          subject to federal government forfeiture;
Estimated $33,000                                            Adams has tentatively agreed to voluntarily
                                                                  surrender to Receivership Estate

~~Hartford Life and Annuity Insurance Co. life insurance policy~~      ~~surrendered for $167,206.60*~~

~~Lincoln National Life Insurance Co. life insurance policy~~          ~~surrendered for $3,678.45*~~

**Hartford Life and Annuity Insurance Co. life insurance policy**   ending account value $13,484.95

**Jewelry**                                                  estimated $40,000

**Firearms**                                                 subject to federal government forfeiture;
                                                             Adams has tentatively agreed to voluntarily

18

|  |  |  |
|---|---|---|
|  |  | surrender to Receivership Estate |
| 1/3 | **Delta Farm Land Investments, LLC**<br>1170+ acres farmland in Oktibbeha County<br>Purchased in 2014 for $2,796,100<br>Encumbered by Trustmark Bank mortgage<br>Owe approximately $2,200,000 | LLC has contract to sell principal asset; hopes to close by December 15, 2018 |
| 1/4 | **KAPA Breeze LLC**<br>1.5+/- acres mixed use land on Highway 30A in Florida<br>Purchased in 2017 for approximately $1,900,000<br>Encumbered by Jefferson Bank mortgage<br>Owe approximately $1,365,000 | valuation in process |
| 1/4 | **Mallard Park, LLC**<br>1,723 acres with hunting lodge in Humphreys County<br>Purchased in 2016 for $2,593,500<br>Encumbered by Southern AgCredit mortgage<br>Owe approximately $2,000,000 | valuation in process |
| 1/4 | **Mash Farms, LLC**<br>808+ acres with hunting camp in Sunflower County<br>Purchased in 2014 for $1,600,000<br>Encumbered by Trustmark Bank mortgage<br>Owe approximately $900,000 | valuation in process |
| 47.5% | **Oxford Springs, LLC**<br>2,300+/- acres undeveloped land in Lafayette County<br>Purchased in 2015 and 2016 for total of $6,158,000<br>Encumbered by First Bank of Clarksdale mortgage<br>Owe approximately $4,500,000 | valuation in process |
| ~~1/6~~ | ~~**707, LLC**~~<br>~~263+ acres recreational land in Holmes County~~<br>~~Purchased in 2009~~<br>~~Encumbered by First Commercial Bank mortgage~~<br>~~Owe approximately $368,000~~ | ~~LLC sold principal asset and dissolved; tendered $6,994.09 representing Adams's, Kelly's, and McHenry's interests to the Receivership Estate~~* |

\* ~~Strikethrough~~ indicates asset has been liquidated and the proceeds are accounted for in the Hancock Bank account balance.